*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CV-383

BLT BURGER DC, LLC, APPELLANT,

v.

NORVIN 1301 CT, LLC, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CAB-8602-10)

(Hon. Anthony C. Epstein, Trial Judge)

(Argued January 7, 2014                    Decided March 13, 2014)

*Paul J. Kiernan*, with whom *John F. Stanton* and *Adam M. Blank*, were on the brief, for appellant.

*Allen V. Farber*, with whom *Gregory A. Mason* and *Adam Scott Kunz*, were on the brief, for appellee.

Before BECKWITH and MCLEESE, *Associate Judges*, and FERREN, *Senior Judge*.

FERREN, *Senior Judge*: BLT Burger DC, LLC (Tenant) appeals an award of damages to Norvin 1301 CT, LLC (Landlord) totaling $158,542 in unpaid rent, taxes, and insurance, and an additional $5.7 million in diminished value of the property that Tenant leased but abandoned after a dispute erupted over the parties'

respective responsibilities. Tenant stopped paying rent and Landlord brought an action for possession, whereupon Tenant surrendered the premises. Landlord then re-entered the property, listed it for rent or sale, and eventually sold it as part of a package with another building that Landlord owned nearby. Tenant sued for breach of the lease, and Landlord counterclaimed alleging Tenant's breach. The trial court granted judgment for Landlord as a matter of law on Tenant's claim, as well as judgment for Landlord on its counterclaim. Only the damages awarded on the counterclaim are at issue here. We vacate (subject to reconsideration on remand) the $158,542 awarded for unpaid rent, taxes, and insurance allocable to the period before sale of the properties; affirm the trial court's ruling that Landlord is entitled to diminished value damages, but vacate the award of $5.7 million; remand for further proceedings to determine the correct calculation of damages; and remand for reevaluation of the attorney's fees and costs awarded Landlord.

**I.**

Landlord owned a three-story townhouse located at 1317 Connecticut Avenue, N.W., which it rented to Tenant for ten years under a lease dated February 17, 2010. Rent commenced on August 3, 2010, beginning with a base rent of $16,000 per month that was to increase over time. Under the lease, Tenant was required to complete approximately $1.8 million worth of construction described

as "Tenant's Work" necessary to make the premises suitable for a restaurant. Tenant also was required to pay real estate taxes and insurance amounting to $94,000 and $13,500, respectively, in the first year. Landlord, in return, was required to pay Tenant $200,000 in partial reimbursement of construction costs. The lease also provided for payment of "percentage rent," under which Landlord would eventually be entitled to a portion of Tenant's gross sales from restaurant operations.

Section 23A of the lease provided that in the event of Tenant's default and Landlord's re-entry, Tenant would remain liable for "any and all damages, deficiency or loss of rent," while "Landlord reserve[d] full power . . . to relet the Premises for the benefit of Tenant." The lease further provided that in the event of "termination," Landlord was entitled to recover the difference between [1] the "cash value of the rent and other charges reserved . . . for the unexpired portion of the Term," and [2] the "then cash rental value . . . for such unexpired portion of the Term" (after deduction of "Landlord's relet costs").[1]

---

[1] Section 23A then provides a "prima facie" valid formula for computing that difference by comparing [1] the rent actually realized upon reletting "within a reasonable time after such termination" with [2] the "present cash value of the future rents hereunder reserved to Landlord for the unexpired portion of the Term" derived by computing "such sum, if invested at four percent (4%) per annum simple interest, as will produce the future rent over the period of time in question."

Section 23E provided that the remedies specified in the lease were "cumulative" and "not intended to be exclusive of any other remedies to which Landlord may be lawfully entitled."

Tenant paid Landlord a $100,000 security deposit and rent for the first month (August 2010) but did not pay rent, taxes, or insurance thereafter. On October 13, 2010, Tenant wrote Landlord by email that Tenant had put the construction project "on hold [until] issues are resolved with the landlord," because Landlord had allegedly failed to correct structural issues with the property and had caused delays in obtaining a construction permit. The next day, October 14, 2010 Landlord sent Tenant a notice of default for failure to pay rent and other required charges and demanded that Tenant make all past due payments by October 26, 2010.[2] Tenant did not make the payments, and Landlord sent Tenant a notice of termination on October 28, 2010.

On November 4, 2010, Landlord filed suit against Tenant in the Landlord and Tenant Branch of Superior Court seeking possession of the premises and back rent. In response, Tenant left the premises and returned the keys to Norvin on

---

[2] Landlord demanded a total of $54,191.74, which included unpaid rent, taxes, and insurance for September and October 2010.

December 3, 2010. Landlord subsequently engaged a leasing brokerage company to relet the premises. Landlord also owned the adjoining building at 1301 Connecticut Avenue, N.W., and simultaneously with its leasing effort engaged another broker to sell both buildings as a package. On July 6, 2011, Norvin sold the two together for $27 million.

On November 12, 2010, Tenant sued Landlord in Superior Court, alleging breach of the covenant of quiet enjoyment and various provisions of the lease. On December 8, Landlord answered and counterclaimed, alleging Tenant's breach for nonpayment of amounts due, as well as for failure to complete the Tenant's Work that would have "added value to the Premises." In its counterclaim, Landlord sought "all damages, deficiencies, loss, costs and expenses in rent, reasonable attorney's fees, court costs, brokerage commissions, and expenses incurred in preparing the Premises for reletting, as well as any and all other damages suffered by Landlord," estimating an amount "not less than $1.8 million" plus attorney's fees and other costs.

During discovery Landlord revised the estimate, informing Tenant that Landlord was then seeking $5.6 million in damages "as a result of being deprived of the increased value of the property caused by [Tenant's] breach. . . . But for

[Tenant's] breaches of the Lease, [Landlord] would have been able to increase the sale value of the building by $5.6 Million, if not more."

On May 16, 2012, the parties filed a Joint Pretrial Statement. Landlord identified, as relief sought, "an award in its favor to include, but not limited to, the dollar amount of lost rent, the loss sustained by [Landlord] as a result of [Tenant's] failure to do the Tenant Work (thereby adversely affecting the value of the building), real estate brokerage commissions paid by [Landlord], pre-judgment and post judgment interest, attorney's fees, expenses and costs." In the pretrial statement, Landlord identified its principal, Norman Livingston, as a fact witness.

The bench trial began February 4, 2013. At the close of Tenant's case in chief, the trial court granted Landlord's motion for judgment as a matter of law, ruling that Tenant, not Landlord, had breached the lease. Landlord then proceeded to present proof of damages. Counsel described Landlord's theory of diminished value: "If the tenant had fulfilled its obligations and done its build out and if it was paying rent as it was suppose[d] to. And . . . if it was paying $16,000 a month, the increased value for sale purposes would have been an additional $5 million or so using the cap[italization] rate that was used for the transaction."

Thereafter, Landlord's principal, Norman Livingston, testified that the sale price of $27 million for the joint sale of the two buildings had been determined by using a 5.25% capitalization rate. He explained, more specifically, that the price had been calculated by dividing the "income, after all of the expenses have been paid on the property," by that rate. He further testified that because BLT had not paid rent, there was "no net income" from 1317 Connecticut Avenue (the premises previously leased to BLT) to factor into the calculation. As a result, he concluded, the sale price was $5.7 million less than if BLT had been paying the rent due.

During Livingston's testimony when his credentials were being established, counsel for Tenant stipulated that Livingston "knows about investment capitalization" and the "area" of "finances." Counsel objected, however, to Livingston's testimony to a limited extent, arguing that Landlord was claiming, improperly, that "the value of the building was affected by [Tenant's] not doing improvements." Counsel for Tenant also argued that, upon sale of the properties, "any further claim of damages or rents is cut off as of that date." Tenant, however, did not present evidence on Landlord's damage claim.

The trial court found that Livingston had "the expertise necessary" to establish the value of the building; that applying the capitalization rate was a "reasonable approach to the estimation of damages"; and that Landlord had made

reasonable attempts to mitigate damages. The court then awarded damages totaling $158,542 for rent, taxes, and insurance for the period from the rent commencement date (August 3, 2010) through the sale of the premises (July 6, 2011), reduced by $116,000 in the rent and security deposit that Tenant had paid.[3] Additionally, the trial court awarded Landlord $5.7 million in diminished value damages.

On February 25, 2013, Tenant filed a motion to alter or amend judgment pursuant to Super. Ct. Civ. R. 59 (e) (2012 Repl.), on the grounds that judgment should have been entered for Tenant and, alternatively, that the trial court improperly calculated Landlord's damages award. The trial court denied the motion on March 27, 2013, ruling that the motion had been untimely filed but that in any event it failed on the merits. In addition, the court granted Landlord's motion for an attorney's fees award of $200,000. Tenant filed a timely appeal.

---

[3] The period between commencement of the lease and sale of the properties covered eleven months. At $16,000 per month, the rent totaled $176,000. The annual real estate taxes were $94,000, and the annual insurance costs were $13,500, for a total of $107,500, reduced to $98,542 for eleven months. The rent, taxes, and insurance for the eleven months, therefore, totaled $274,542, from which Tenant received a credit of $116,000 for payment of the first month's rent plus a $100,000 security deposit. That left the $158,542 awarded by the court.

## II.

The principal questions on appeal are:

1.  Whether the sale of the 1317 property entitled Landlord to damages measured by reference to its diminished value upon sale after termination and surrender of the lease;

2.  If diminished value damages are awardable, whether the $5.7 million was properly calculated;

3.  Whether the lease entitled Landlord to recover damages attributable to the unpaid rent, taxes, and insurance during the period between termination and surrender of the lease (December 3, 2010) and the sale of the formerly demised premises (July 6, 2011).

## III.

### A.

In addressing these issues, we begin by outlining the approaches to damages for breach of a lease commonly taken in this jurisdiction. In *Truitt v. Evangel*

*Temple, Inc.*,[4] this court acknowledged three long-established options that a landlord has when the tenant wrongfully abandons the premises and repudiates the lease: (1) accept the abandonment and terminate the lease in full satisfaction; (2) refuse to acquiesce in the abandonment, re-enter and relet the premises, and hold the tenant liable for any deficiency in the rent; or (3) refuse to re-enter, allow the premises to remain vacant, and hold the tenant for the full rent.[5] Landlord exercised the second option, with its obligation to mitigate Tenant's damages by attempting to relet – a remedy detailed in § 23A of the lease. This case, however, adds a twist: Landlord simultaneously advertised 1317 for rent and for a packaged sale with 1301, culminating in a sale of the combined properties for $27 million.

The question thus becomes: when a landlord augments its effort to mitigate damages by simultaneously offering the premises for sale as well as for rent – intending, presumably, to take the best offer all things considered – how does this hybrid approach affect the nature and amount of the damages a tenant can be expected to pay for the breach? As yet, there has been no answer under District of Columbia law; thus, we look at how other jurisdictions have resolved issues of damages upon sale of property surrendered after breach of a lease.

---

[4] 486 A.2d 1169 (D.C. 1984).

[5] *Id.* at 1172.

There is a split of authority as to whether sale of the property is appropriate mitigation or, instead, cuts off a landlord's right to damages at time of sale. Some courts appear to permit collection of damages calculated by reference to the rent lost during a period of reasonable diligence to relet the premises after termination and surrender, but they would preclude an award of further damages attributable to lost rent for the period after the date of sale.[6] The Maryland Court of Appeals, for example, has observed that a "resale, akin to reletting for a term longer than the original term, is so inconsistent with the tenant's estate as to allow for no other interpretation than that the landlord had reentered in order to accept a surrender" –

---

[6] *See Wilson v. Ruhl*, 356 A.2d 544, 546, 547 (Md. 1976) (under Maryland real property statute, listing property for sale rather than rent does not satisfy landlord's duty to mitigate damages upon landlord's re-entry after termination of lease; duty to mitigate requires landlord "to exercise reasonable diligence to relet the premises," although listing "for sale or rent and later for rent" – and eventually reletting – "did satisfy that duty"); *First Wis. Trust Co. v. L. Wiemann Co.*, 286 N.W. 2d 360, 368 (Wis. 1980) (landlord's sale of property evidenced clear intent to elect between (1) acceptance of surrender and termination of lease, and (2) taking possession of premises for purpose of mitigating damages; by electing sale, landlord accepted surrender and termination, and thus is deprived of right to recover damages for future rent" after premises were sold); *cf. Enak Realty Corp. v. City of New York*, 109 A.D.2d 814 (N.Y. App. Div. 1985) (foreclosure sale cut off landlord's claim against tenant for rents due subsequent to the sale).

an act that, under Maryland law, "terminated the tenancy altogether" with no "further obligation to pay rent."[7]

Other case law, however, recognizes that a sale of formerly leased property after reasonable diligence to relet "is an appropriate effort to mitigate damages" calculated by reference to the diminished value of that property after the breach.[8] New York's *Latham Land* decision[9] is particularly informative because the facts are so similar to those we consider here. The parties entered into a contract whereby the defendant-tenant agreed to build, lease, and operate a restaurant on a

---

[7] *Wilson*, 356 A.2d at 547.

[8] *Latham Land I, LLC v. TGI Friday's, Inc.*, 96 A.D.3d 1327, 1332-33 (N.Y. App. Div. 2012) (in light of tenant's breach and landlord's failed efforts to find new tenant, sale of property was "appropriate effort to mitigate damages" after termination of lease; and damages are ascertained by capitalizing at market rate the average annual base rent for the property with the "lease in place" and calculating the property's diminished value by subtracting the actual sale price without the lease); *accord McGuire v. City of Jersey City*, 593 A.2d 309, 315 (N.J. 1991) ("we think it is more appropriate to consider the landlord's sale of the premises as a mitigation, rather than as an acceptance of surrender," but sale ended right to damages for lost future rent because "sale price . . . compensate[d] for the value of the future rental income"); *see also Millikan v. American Spectrum Real Estate Servs. California, Inc.*, 12 Cal. Rptr. 3d 459, 461, 464-65 (Cal. Ct. App. 2004) (while "jilted landlord" will nearly always attempt to mitigate damages by making reasonable efforts to relet property, nothing in "law" or "reason" would "prohibit a landlord from selling the property to mitigate his loss, provided the trier of fact finds a sale to be a reasonable means to avoid the further loss of rental revenue").

[9] See *supra* note 8.

portion of the plaintiff-landlord's property. However, ten months after the contract was signed, following a period of disputes between the parties, the tenant – never having commenced construction – terminated the contract. The landlord sued, and, failing to find another tenant, ultimately sold to a third party both the property designated for the lease and an adjacent parcel already improved with another restaurant. As damages, the landlord did not seek "actual rent due" because the tenant had not yet "create[d] the leasehold estate promised by the contract."[10] Rather, the landlord sought and recovered general damages "for the loss of the value of the leasehold interest promised by the parties' agreement," measured by the diminished "value of [the] property following defendant's breach" compared to what the value "would have been had [the tenant] honored the lease agreement."[11]

If, contrary to *Latham Land's* approach, we were to honor the first line of cases from Maryland and Wisconsin,[12] Landlord would be entitled to the trial court's award of $158,542 in damages attributable to unpaid rent, taxes, and

---

[10] *Id.* at 1330.

[11] *Id.* at 1331.

[12] See *supra* note 6.

insurance up to the date of sale,[13] but not to the award of diminished value damages.  More specifically, if a sale (as opposed to reletting) is inconsistent with recognized mitigation of damages for breach of the lease – that is, if a sale is tantamount to unqualified acceptance, rather than rejection, of a surrender – then after-sale damages would not be allowable; only an award of damages reflecting unpaid rent and related costs that accrued *before* the sale, while the landlord was trying diligently to relet the premises, would be consistent with the rent-related damages normally awarded upon termination and surrender.

If, on the other hand, we were to conclude that a sale after surrender and termination could be characterized as appropriate mitigation of the breach, as New York, New Jersey, and California courts have ruled,[14] and if that sale were to have resulted in diminished value of the property when compared to its value with the

---

[13]  See *supra* note 3.  Technically, the relief attributable to "rent" lost *after* termination of a lease is an award of "damages" (typically measured by reference to the value of the rent lost); it is not lost "rent," as such, because the obligation to pay "rent" ceases upon "surrender" of the premises.  *See Ostrow v. Smulkin*, 249 A.2d 520, 522 (D.C. 1969) (if landlord "retakes possession by legal process or by accepting a voluntary surrender of possession," tenant's obligation to pay future "rent" ceases, although tenant may be liable for "damages" for breach of contract).  Thus, damages for lost "rent" extend only to the date of "termination of the lease," defined for this purpose as "surrender" of the premises, not earlier by reference to "commencement of the action or the entry of judgment."  *Id*.

[14]  See *supra* note 8.

lease in place, then we would have to accept the trial court's decision to award such damages if, but only if, such an award is consistent with the damages provisions in the lease – to which we now turn.

**B.**

Tenant, as the appellant, has the burden of proving trial court error in selecting the measure and calculating the award of damages. Citing Maryland's *Wilson* decision,[15] Tenant stresses that § 23A of the lease contains extensive language measuring Landlord's remedies solely by reference to lost rent, leaving no room for damages based on the "diminished value" of property sold (rather than relet) after termination of the lease. Tenant did not make that argument at trial, however, but the argument fails in any event because the proffered legal predicate for it is insufficient. The case law on which Tenant relies does not contemplate the kind of lease provision, present here, that authorizes remedies other than – *i.e.*, as alternative to – the options that we recognized in *Truitt v. Evangel Temple, Inc.*[16] Section 23A itself permits the award of "any and all damage, deficiency or loss of rent," but, of more direct significance, § 23E, a catch-all provision, expressly

---

[15] See *supra* note 6.

[16] 486 A.2d 1169 (D.C. 1984); see text accompanying *supra* note 5.

authorizes – in addition to the relief prescribed in § 23A – all "other remedies to which Landlord may be lawfully entitled."

Tenant does not persuasively interpret § 23E in a way that would limit its reach to discrete and subordinate damages, such as injury to the premises or unpaid construction costs – a restrictive reading that, in Tenant's view, would leave § 23A alone to prescribe all remedies for a breach justifying termination. To the contrary, in light of persuasive case law we have cited from New York and other jurisdictions,[17] we read § 23E to have "lawfully entitled" Landlord, upon termination of the lease, to recover damages by selling the property and seeking relief based on diminished value of the premises, if reletting was not a realistic option and the facts otherwise justified that remedy.[18]

Tenant does not argue on appeal that Landlord lacked diligence in seeking a successor lessee to mitigate damages. We, therefore, turn to Tenant's arguments as to why, in the alternative, diminished value is not a proper measure of damages under the circumstances before us. Tenant did not contend at trial that the lease

---

[17] See *supra* note 8.

[18] We express no opinion as to whether a sale in lieu of reletting is appropriate mitigation when a landlord, upon termination of a lease, seeks only to sell the property, without an effort to relet it.

categorically precluded diminished value damages; and, as briefly noted earlier and elaborated below, Tenant only partially contested at trial whether Landlord effectively alleged that theory. Tenant's new counsel on appeal attempts to make up for these oversights – and push diminished value damages out of the case − by stressing that the only pretrial reference to the claimed $5.7 million in diminished value was a one-sentence reference to $5.6 million in an answer by Landlord to an interrogatory; that according to the Joint Pretrial Statement, Landlord had subsequently limited its concern about diminished value to a claim that Tenant had failed to undertake "Tenant Work" required under the lease for renovation of the premises as a restaurant (earlier claimed by Landlord to cost Tenant $1.8 million); and that the Pretrial Order limited all claims and defenses to "those described in the parties' Joint Pretrial Statement . . . absent a showing of good cause or excusable neglect."

Over minimal, virtually irrelevant objection, however, the trial court – implicitly relying on "good cause" or "excusable neglect" – informally modified the Pretrial Order by permitting Landlord's witness, Norman Livingston, to testify at trial in support of the $5.7 million. Apparently misperceiving where Livingston's testimony was headed, Tenant's counsel objected only to the testimony about value attributable to failure to complete "improvements" (the

Tenant Work), an objection incorporated within counsel's more fundamental contention (rejected above) that sale of the property cut off all damages.[19]

In our view, new counsel on appeal fails to establish that counsel for Tenant at trial had preserved a categorical attack on diminished value damages. Counsel on appeal contends, nonetheless, that diminished value damages have not been established because they are "special," not "general," damages; they must be specially pleaded as such; they can be proved only through expert testimony; the $5.7 million award failed that "expert" requirement because Livingston was not properly qualified for that purpose; and Livingston's valuation in any event was invalid as a matter of law – to the point of plain error, a manifest miscarriage of justice.[20]

---

[19] Counsel for Tenant objected as follows: "I'm going to object to the line of questioning if they're going to argue is how the value of the building was affected by BLT not doing improvements. I am [not] aware of any case authority that says when somebody sells a building, even if – of the lease – they can recover as damages whatever [e]ffect they might try to claim not doing damages but – not doing build-out's. Apparently − come to sale any further claim of damages or rents is cut off as of that date."

[20] *See Finkelstein v. District of Columbia*, 593 A.2d 591, 595-96 (D.C. 1991) (new trial may be warranted if jury "verdict is so unreasonably high as to result in a miscarriage of justice").

The *Latham Land I* case from New York characterized damages on facts almost identical to those here as general damages,[21] whereas other courts (typically considering damages allegedly caused by anchor tenants to other proprietors in shopping malls) have characterized diminished value as special damage.[22] We need not decide the nature of the damages here, however, as Tenant never questioned at trial whether the damages articulated by Livingston were special or general, or whether Livingston's theory was pleaded properly or not. The first important question on valuation, therefore, is whether expert testimony is required for the valuation of Landlord's damage claim.

---

[21] *Latham Land I, LLC v. TGI Friday's, Inc.*, 96 A.D.3d 1327, 1330, 1332 (N.Y. App. Div. 2012) ("[G]eneral (or direct) damages . . . compensate for the value of the promised performance. . . . Plaintiff seeks to recover for expectation damages flowing from defendant's breach, i.e., the loss of the benefit of its bargain. In our view, these are direct damages, which are the natural and probable consequence of the breach.") (internal quotation marks omitted).

[22] *See BVT Lebanon Shopping Ctr., Ltd. v. Wal-Mart Stores, Inc.*, 48 S.W.3d 132, 136 (Tenn. 2001) (diminution in value is proper measure of damages when anchor tenant breached implied covenant of continued occupancy in shopping center; concurring opinion characterizes diminished value damages as special damages); *Pleasant Valley Promenade v. Lechmere, Inc.*, 464 S.E.2d 47, 62-63 (N.C. Ct. App. 1995) (diminished value damages may be applied as special damages where anchor store left shopping center if such damages were foreseeable or contemplated); *see also Hornwood v. Smith's Food King No. 1*, 772 P.2d 1284, 1286 (Nev. 1989) (diminution in value of shopping center as result of anchor tenant's breach of lease was foreseeable).

Without acknowledging that expert testimony is required, Landlord contends that Tenant stipulated at trial to Livingston's expert ability to spell out why Landlord's diminished value damages totaled $5.7 million.[23]  The stipulation to which Landlord refers was counsel's statement that Livingston "knows about investment capitalization and the area, I guess, finances."  That is hardly a stipulation that comes to grips with the kind of expertise needed.  On the other hand, at the time this stipulation was offered, counsel had not been objecting to Livingston's testimony beyond questioning whether failure to complete the Tenant Work was germane to valuation of damages – far from a fundamental rejection of Livingston's testimony.  Under these circumstances, therefore, we cannot stand in the way of Landlord's contention that Tenant did not effectively object to Livingston's testimony as an expert on the damages claimed.

This appeal has been premised, by both parties, on the assumption that if diminished damages are awardable at all, they shall be awarded − upon proper

---

[23]  The New York case characterizing as general, not special, damages the kind of relief that Landlord claims here on similar facts adverted to "expert" opinion on plaintiff's damages.  *See Latham Land I*, 96 A.D.3d at 1331.  And case law from this jurisdiction evaluating real estate appraisals for purposes of local taxation address valuations by expert appraisers.  *See, e.g.*, *Wolf v. District of Columbia*, 597 A.2d 1303, 1305 (D.C. 1991).

computation.[24]  We come, therefore, to the dispositive question:  whether Norman Livingston's valuation of $5.7 million in damages can stand.

## C.

We must conclude, in light of compelling case law from this jurisdiction, that Livingston's methodology was flawed at the core.  Despite Tenant's failure to challenge it effectively at trial, we must agree with Tenant's counsel on appeal that a manifest miscarriage of justice occurred.

To calculate diminished value, Livingston first applied a 5.25% capitalization rate to the income generated by 1301 alone, the computation, he says, that generated the $27 million sale price for 1301 and 1317 combined.  Next,

---

[24]  We have no way of knowing for sure whether diminished value damages, after proper calculation, will exceed the value (after appropriate imputed mitigation) of the unpaid "rent and other charges reserved" (quoting § 23A) over the balance of the lease term. Landlord, however, assuredly believes that diminished value damages will be the greater, as apparently does Tenant, whose opening brief asserts that, "had the Lease not been breached," Tenant "would have paid the Landlord a little more than $2 million in rent over the next 10 years." Tenant, however, while arguing that the lease does not permit diminished value damages, does not go further to contend that, if they are awardable, they must be capped by a lower value calculated for rental stream damages under § 23A. (Nor in any event is it immediately clear why a landlord, if compelled by circumstances to mitigate damages by selling rather than reletting the property, should have damages limited by a rental measure.)

in order to calculate how much more the combined properties would have been worth if Tenant's lease had remained in place, Livingston took the "first year's net rent" (including real estate taxes and insurance) from 1317, which totaled approximately $299,000, and applied the same 5.25% capitalization rate, dividing $299,000 by .0525. The result was approximately $5.7 million – the amount, according to Livingston, that represented the value lost to the packaged properties as a result of the missing income stream attributable to 1317 when leased.

We begin our review of the $5.7 million by noting an important concession by counsel for Landlord. At oral argument he was asked whether he agreed that if 1317 "had some value, then the $5.7 million number has to be incorrect?" To which counsel replied, "I think that that's likely a fair statement."[25] Next, without regard to other claimed errors in Livingston's methodology, we note four fundamental mistakes. *First*, Livingston erroneously justified the sale price for the combined properties ($27 million) by excluding all potential income from 1317, which was vacant at the time of sale. He thereby posited a substantially deflated

_____

[25] Landlord's counsel added: "I think that the Tenant, who had every opportunity to cross-examine, could have asked the question, 'What value did you ascribe to the property, Mr. Livingston?'" Apparently Landlord's counsel had forgotten that counsel for Tenant had asked Livingston whether he knew "what the 1317 alone would have sold for," and that Livingston had answered, "No."

value of the properties. Given the income potential of 1317, one cannot reasonably say that its temporarily vacant state permitted valuing that property at zero dollars.

*Second*, Livingston used a 5.25% capitalization rate for the sale of *both* properties (1301 and 1317), and yet testified that he had imputed "no net income" to 1317 and did "not know what . . . 1317 alone would have sold for." It is not clear, therefore, whether 1317 was actually priced into the deal and, if it was not, whether the capitalization rate should nonetheless have remained the same and the price still $27 million.

*Third*, in applying the income method of valuation, Livingston valued 1317 incorrectly by relying exclusively on one year's income under Tenant's abandoned lease. As explained more fully below, appraisal of the market value under the income method requires consideration of income over several years, commonly including income evidence from comparable properties.

*Fourth*, in taking what Livingston called the "first year's net rent" as the basis for calculating the capitalized value of 1317, Livingston included taxes and insurance as well as rent in his "net" rent figure. In doing so, he actually relied on a "gross" rent figure that overly inflated the lost value of the lease, and thus overly

increased the diminished value of 1317 by erroneously exaggerating the difference between what the estimated selling price of the two properties (at market value) should have been and the $27 million Landlord received.[26]

Contrary to Livingston's approach, our case law, based on standard real estate appraisal literature,[27] indicates that under the income method of valuation, an appraiser should rely *not* on a property's current income but, rather, on an imputed income, which this court has characterized as "stabilized annual net income"

---

[26] We elaborate below that, in valuing real property by using the "income" method, appraisers rely on "stabilized annual net income," *Wolf*, 597 A.2d at 1309, meaning the owner's income after ordinary business expenses, including taxes and insurance (as well as utilities, maintenance, and other ordinary costs). *See* AMERICAN INSTITUTE OF REAL ESTATE APPRAISERS, THE APPRAISAL OF REAL ESTATE 451, 457 (13th ed. 2008). The "net" figure is proper if only because a landlord's receipt of taxes and insurance (or other operating expenses) from a tenant, in addition to rent, reflects payments automatically passed on to third party obligees, not money retained as earnings representing enhanced value of the property. Therefore, by adding taxes and insurance payments to the rent to establish the base figure for capitalizing income, Livingston relied on an inflated, gross income figure that resulted in overvaluation. More specifically, to calculate the $299,000 that served as the "net rent" basis for Livingston's capitalization, he added together $192,000 for rent, $94,000 for real estate taxes, and $13,500 for insurance (actually totaling $299,500). Had he properly limited "net rent" to the $192,000 and applied his 5.25% capitalization rate, his value for 1317 would have been approximately $3.7 million instead of $5.7 million.

[27] *Wolf*, 597 A.2d at 1307 (quoting AMERICAN INSTITUTE OF REAL ESTATE APPRAISERS, THE APPRAISAL OF REAL ESTATE 272, 504-05 (8th ed. 1983)).

derived by reference to income and expenses over a period of several years.[28]

More specifically, the value of rental property, when based (as here) on the "income" method,[29] is a reflection of "income earning potential," meaning an estimate of the "present worth of a future income stream" that "an investor could expect from the building."[30] And that value can be derived not only from the earnings from the subject property for current and earlier years, but also from the "income streams for numerous other" comparable properties that offer perspective in finalizing the stabilized annual net income.[31] Of significance here, therefore, "[r]ent for vacant or owner-occupied space is usually estimated at market rent

---

[28] *Id.* at 1309 (discussing that "actual *earning*" may be "relevant evidence" of future earning potential, "but it is the future potential, not the current earnings themselves, that must constitute the legal basis for valuation"). Landlord argues that *Wolf* is inapposite because it is a tax assessment case applying statutes and regulations that are inapplicable here. We cannot agree. *Wolf*, citing standard authority, see *supra* notes 26 and 27, relies on the generally accepted approach to real estate, including valuation of leases. The fact that particular tax statutes and regulations were applicable in *Wolf* does not undermine our analysis, as those legislative edicts merely incorporate generally accepted valuation principles.

[29] *See id.* Another method bases valuation on "comparable sales." *See id.* at 1310-11. According to the American Institute of Real Estate Appraisers, an appraiser typically "selects a final value estimate from among two or more indications of value," whereas Livingston relied on only one (income method). *Id.* at 1307 (quoting THE APPRAISAL OF REAL ESTATE (8th ed. 1983) at 504).

[30] *Id.* (quoting *District of Columbia v. Washington Sheraton Corp.*, 499 A.2d 109, 115 (D.C. 1985) (internal quotation marks omitted)).

[31] *Id.*

levels," not at zero, as Livingston posited for 1317 in justifying the $27 million selling price of 1301 and 1317 as a package.[32]

For the moment, however, let us take Livingston's own number. Assuming, as he testified, that the lease for 1317 had remained in place and that he relied on the same 5.25% capitalization rate for both properties, he calculated a diminished value for 1317 of $5.7 million. If so, Landlord's selling price, if not $32.7 million, should at least have exceeded the $27 million paid for both properties.[33] The fact that Landlord settled for less should not be held against Tenant to the point of making up the entire difference. Because of Livingston's faulty (or at least non-established) premise that the $27 million represented the true market value against

---

[32] THE APPRAISAL OF REAL ESTATE (13th ed. 2008) at 453.

[33] To illustrate, we shall correct only one part of Livingston's faulty calculation by changing his "first year's net rent" from $299,000 to the correct figure, $192,000. When that amount is capitalized by dividing it by 5.25%, the value achieved is approximately $3.7 million. See *supra* note 26. If we then say, hypothetically, that this figure also was derived from an expert's determination of "stabilized net annual income" from the 1317 portion of the package sold, then the selling price should have been approximately $30.7 million, leaving a diminished value of $3.7 million, not $5.7 million. We do not at all intend to say that these hypothetical calculations bear any resemblance to what an expert valuation, properly conducted, would yield. We merely wish to show that even according to Livingston's own "net" income premise (adjusted to omit taxes and insurance), his result was faulty. These comments, moreover, should not obscure the fundamental defect: that Livingston's analysis accorded no value whatsoever to the 1317 component of the two properties sold together.

which diminished value damages should be measured, we have no way of knowing what that value should be. And because Livingston's valuation of 1317 itself was flawed, we have no way of knowing what the diminished value (if any) assessable against Tenant should be. In short, from Livingston's testimony we cannot discern a valid minuend or subtrahend, and thus a new hearing on diminished value is required.

We, therefore, must reverse the portion of the trial court's order awarding Landlord $5.7 million in diminished value damages and remand for further proceedings, including all additional, relevant evidence each party wishes to introduce, for proper calculation of the diminished value at issue and a revised order awarding damages for Tenant's breach.[34]

---

[34] In contrast with Livingston's methodology, the expert in *Latham Land I, LLC*, 96 A.D.3d at 1331, began by calculating the value of the subject property assuming that the terminated lease was in place ($2,503,846). He then took the actual sale price of two combined properties ($2,348,037), which included the subject property without the lease, and subtracted the value of the other property ($1,373,077), leaving $974,960 as the value of the subject property without the terminated lease in place. The expert then subtracted the $974,960 from the value of the subject property with the lease in place ($2,503,846), arriving at diminished value damages of $1,528,886. In contrast with Livingston's analysis in the present case, there was no indication that the actual sale price of the two properties in *Latham Land* was deflated, as the *Latham Land* analysis – unlike the Livingston analysis – accounted for the full value of the property with the (terminated) lease in place.

**D**.

Tenant also questions the portion of the $158,542 awarded for unpaid rent, taxes, and insurance during the seven-month period between termination and surrender of the lease (December 3, 2010) and the date the properties were sold (July 6, 2011).[35] Tenant contends that under the lease and the law, this award is invalid, and that in any event the award fails because, when combined with diminished value damages, the result is double-counting of damages for this period.

The first question is whether Tenant raised, and thus preserved, a challenge to the $158,542 at trial. We believe that it did, albeit indirectly. Before trial, Tenant was only on notice, from the Joint Pretrial Statement, that Landlord was seeking damages for [1] "lost rent" and related expenses and attorney's fees, coupled with [2] the loss sustained "as a result of [Tenant's] failure to do the

---

[35] Actually, the charges under the lease for rent, taxes, and insurance for the period prior to sale totaled $274,542, when the $16,000 in monthly rent and the monthly shares of real estate taxes ($7,833.33) and insurance ($1,125) are added together and then multiplied. Because Tenant had previously paid for one month's rent and given Landlord a security deposit of $100,000, a portion of the $274,542 had already been paid at time of judgment, leaving $158,542 due. See *supra* note 3. For convenience we use this latter, judgment figure for the pre-sale damages at issue.

Tenant Work (thereby adversely affecting the value of the building)." At trial, however, the court permitted Landlord to inflate its "affected value" argument into a full blown "diminished value" measure of damages. Counsel for Tenant objected to the flow of argument on two grounds: that the Tenant Work was irrelevant to the measure of damages and that, in any event, "come to sale[,] any further claim of damages or rents is cut off as of that date." In short, Tenant was advocating the *Wilson*[36] line of cases that, upon sale, damages from termination and surrender of the lease ended; only pre-sale damages were awardable. The trial court overruled the objection but invited counsel to "brief that."

Thereafter Landlord's witness, Norman Livingston, testified as to diminished value damages, concluding that they were $5.7 million. Landlord's counsel then referred to damages "prior to July of 2011" (*i.e.*, before the properties were sold). Counsel had apparently submitted dollar amounts, which the judge was sorting through when he stopped to acknowledge Tenant's counsel. A long discussion ensued, not on the pre-sale damages but on diminished value damages, during which the judge, changing the subject again, commented that "the rent and the insurance and real estate taxes," before the sale, were "undisputed." After further discussion of diminished value, the trial court returned again to pre-sale

---

[36] See *supra* note 6.

damages, acknowledging Tenant's argument that Landlord's *total* damages should be limited to the pre-sale loss of "rent, real estate taxes, and insurance," without addition of post-sale diminished value damages, and inviting Tenant's counsel again to "brief the issue." The court then went on to calculate the net pre-sale damages at $158,542.[37] Whereupon the discussion turned to attorney's fees, followed by the court's announcement that it would be "entering judgment in the amount we just discussed" ($5.7 million plus $158,542). The court then acknowledged its anticipation of a Rule 59 (e) motion and invited the parties to "file whatever supplemental brief[s] you want to file."

At trial, therefore, counsel for Tenant, while arguing against diminished value damages, did not directly challenge the $158,542 pre-sale damage award. Presumably counsel failed to do so, however, because, under Tenant's theory of the case, if post-sale, diminished value damages were *not* awardable – as Tenant was arguing – then all pre-sale damages *would* be awardable. That is to say, only if Tenant were to lose the argument that the court invited its counsel to brief would Tenant be squarely faced with the $158,542 issue. Under these circumstances, therefore, it is not a stretch to say that, by inviting counsel to brief Tenant's opposition to diminished value damages, the court implicitly invited counsel to

---

[37] See *supra* note 3.

brief any fallback argument on damages in the event that the court were to reject counsel's principal contention. This understanding of the leeway the court was affording counsel is particularly appropriate because Tenant's trial counsel, in light of the Joint Pretrial Statement limiting all claims and defenses to "those described" therein (absent "good cause" or "excusable neglect"), had little warning before trial that full blown diminished value damages would be claimed.[38]  Thus, counsel

---

[38]  In his brief, counsel for Landlord argues that Tenant could not have been surprised at trial by Landlord's claim for the full measure of diminished value damages, because Landlord's answer to an interrogatory dated April 11, 2012, had disclosed a claim for $5.6 million. That interrogatory, however, has no currency in the discussion of pretrial notice, given the later Pretrial Order of June 14, 2012, limiting Landlord's damages to those expressly claimed in the Joint Pretrial Statement of May 16, 2012. Landlord's counsel insists, to the contrary, that the Joint Pretrial Statement *did* give notice of Landlord's claim to full blown diminished value damages. He quotes from that statement:

> ". . . Norvin seeks damages including, but not limited to
> . . . the loss in value of its property as a result of BLT's
> . . . failure to occupy the premises, and failure to pay
> monies in accordance with the rent roll . . . ."

Landlord's counsel, however, used ellipses to omit from the Joint Pretrial Statement the very limitation on claimed diminished value damages (italicized below) that Tenant's counsel understood, and stressed to the court, at trial (see *supra* note 19 and accompanying text):

> "Norvin seeks damages including, but not limited to . . .
> the loss in value of its property as a result of BLT's
> *failure to do the Tenant Work*, failure to occupy the
> premises, and failure to pay monies in accordance with
> the rent roll . . . ." (emphasis added).

(continued . . .)

should not necessarily have been expected on the spot to articulate a fallback objection in this complicated area of damages analysis.

In its Rule 59 (e) motion, however – now formally confronted with the trial court's order for diminished value damages – counsel for Tenant began to argue that the court had also improperly granted Landlord "unpaid rent for September, 2010 through July, 2011," as well as damages for "the purported diminution in the value of the Building."  Added counsel:  "Wholly aside from *this award's constituting double counting*, it is insupportable as a matter of law and as a matter

---

(. . . continued)

On one level of analysis, of course, every element of value that counsel described would be diminished by breach of the lease. As to the recognized category of "diminished value" damages, however, the language quoted above does not provide clear pretrial notice that Landlord was seeking the full measure of such damages, rather than those limited to loss in value as a result of Tenant's failure to complete renovations.  This language is especially unclear in light of Landlord's earlier statement in the same Joint Pretrial Statement that it was seeking "lost rent, loss of the value of the Tenant Work as that otherwise would have affected the value of the property, and other damages" including attorney's fees. Here, Landlord expressly mixes traditional damages calculated solely by reference to the future rental stream, as under § 23A of the lease ("lost rent") with one mere element of diminished value damages ("Tenant Work"), further implying exclusion of a larger universe of diminished value damages.

In sum, the Joint Pretrial Statement, when read as a whole, does not make clear that Landlord was seeking diminished value damages for Tenant's breach beyond its failure to complete Tenant Work, valued by Landlord in paragraph 38 of its counterclaim at $1.8 million − far less than the $5.7 million in diminished value damages claimed later at trial after the court lifted the damages limitation prescribed in the Pretrial Order.

of fact" (emphasis added). Thereafter, the trial court rejected this "conclusory assertion" of "double counting" because the "damages relate to different time periods."

We believe that all things considered, Tenant's contention that it preserved a challenge to the $158,542 for appeal, including the double-counting argument, has some heft. We could not easily conclude under the circumstances that preservation failed on the ground that Tenant was required to present its pre-sale damages argument in full at trial, rather than offer it in the Rule 59 (e) motion that the trial court invited on the measure of damages.[39]

---

[39] *Compare W.M. Schlosser Co., Inc. v. Maryland Drywall Co., Inc.*, 673 A.2d 647, 651 n.9 (D.C. 1996) (argument "implicit" in argument in trial court "can fairly be held to encompass its argument in this court") (internal quotation marks omitted) *and Mills v. Cooter*, 647 A.2d 1118, 1123 n.12 (D.C. 1994) (although "counsel made little if any mention" at trial of point emphasized in appeal, defendant "sufficiently articulated at trial and in his motion for judgment n.o.v." his claim that plaintiff's evidence was "insufficient to establish a wrongful departure [from] the standard [of] care, and parties are not limited to the precise arguments they made below"), *with Wolff v. Washington Hosp. Ctr.*, 938 A.2d 691, 694 & n.1 (D.C. 2007) (in reviewing contention in Rule 59 (e) motion not presented at trial, court perceived "no good reason to make an exception to the general rule that a party must make a specific objection in the trial court to provide the judge an opportunity to correct any mistake, and the opposing party a chance to address and present evidence on the alleged trial court error") (internal quotation marks and alterations omitted).

We, therefore, turn to the merits. In questioning the $158,452, Tenant implicitly erases its earlier concession that pre-sale damages under *Ostrow* could be awardable after termination and surrender of the lease. Tenant leads off its argument on appeal by stressing that Landlord exercised the first option under our *Truitt* decision,[40] meaning that Landlord, in terminating the lease and suing for possession, accepted surrender of the premises in full satisfaction of Tenant's lease obligations. It follows, says Tenant, citing our decision in *Ostrow*[41] that its obligation to pay "rent," as such, ceased as of the surrender date, December 3, 2010. Tenant next acknowledges, however, that also under *Ostrow*, Landlord would be entitled to post-surrender contract "damages" measured by the rent and related expenses unpaid under the lease, as mitigated by reletting the premises. Nonetheless, argues Tenant, by failing to relet – by selling instead – Landlord did not take the fundamental step necessary to claim contract damages; it forfeited that claim and accordingly is not entitled to the full $158,542.[42]

---

[40] *See Truitt v. Evangel Temple, Inc.*, 486 A.2d 1169, 1172 (D.C. 1984) (including text accompanying *supra* note 5); RESTATEMENT (SECOND) OF PROPERTY, LANDLORD AND TENANT § 12.1 (3) (a) (1977).

[41] *Ostrow v. Smulkin*, 249 A.2d 520 (D.C. 1969); see *supra* note 10.

[42] Under *Truitt's* first option, a landlord's acceptance of termination and surrender of the lease, after the tenant has abandoned the premises in breach of the lease, is deemed to have fully satisfied the lease obligations. See *supra* note 40. That ends the matter; the landlord has not left itself room to pursue damages. (continued . . .)

Tenant's analysis is flawed. In the first place, we have concluded that Landlord's simultaneous effort to relet and sell the 1317 property was an authorized pursuit of contract damages under §§ 23A and 23E of the lease. Furthermore, the pre-sale damages awarded by the court reflect the very rental-stream lease provisions of § 23A that Tenant embraces. Thus, Tenant's argument – that no damages are awardable for the seven-month period between surrender and sale because Landlord eventually sold rather than relet – is a nonsequitur that must fail.[43] To this point in Tenant's argument, moreover, no "double counting" has been involved because Tenant never acknowledged any damages for that seven-month period. Once the trial court rejected Tenant's position, however, and

---

(. . . continued)

Under the second *Truitt* option, however, the landlord does not acquiesce in the abandonment but instead reenters the premises to mitigate damages by reletting and seeking damages from the tenant based on the difference, if any, between the rental stream in the abandoned lease and the rentals contracted under the new lease. *See Truitt,* 486 A.2d at 1172 (including text accompanying *supra* note 5); RESTATEMENT (SECOND) OF PROPERTY, LANDLORD AND TENANT § 12.1 (3)(b). Although Tenant purports to rely on *Truitt's* first option to characterize this case, Tenant's acknowledgment that, under *Ostrow*, Landlord is entitled to post-surrender damages effectively shifts the characterization to *Truitt's* second option – as we, too, have understood the situation.

[43] Even the *Wilson* case from Maryland on which Tenant fundamentally relies recognizes contract damages during a period in which a landlord advertises simultaneously to relet or sell. *See Wilson v. Ruhl*, 356 A.2d 544, 546, 547 (Md. 1976); *supra* note 6.

confirmed that Landlord indeed was entitled to pre-sale contract damages, Tenant was primed for a fallback argument that those damages would result in double counting.[44]

To put that double-counting argument in perspective, it will be useful to refer again to New York's *Latham Land* decision, in which the landlord – eschewing damages based on the "actual rent due" – elected a different, single measure of damages: the diminished value of the property derived from an expert's calculation of the "difference between the value of the property with the lease in place" at the time of the breach, and "the value . . . actually received for the sale of the property" ten months later.[45]  In contrast, Landlord in this case elected two, sequential measures of damages:  first, the damages calculated by reference to the rent, taxes, and insurance payable under the lease during the seven-month period

---

[44]  At this juncture it is important to clarify that Tenant does not dispute its responsibility under *Ostrow* for unpaid rent, taxes, and insurance for the four-month period (August 6 - December 3, 2010) before termination and surrender.  As noted earlier, Tenant initially had paid Landlord $16,000 for the first month's rent plus a $100,000 security deposit.  When the total attributable to those four months ($99,833) is subtracted from that $116,000, that leaves a credit of $16,167 going forward against the damages awarded for the ensuing seven months ($174,708), leaving the $158,542 in unpaid pre-sale damages at issue.  As noted earlier (see *supra* note 36), for purposes of convenience when referring to damages attributable to the "period between termination/surrender and sale," or to "pre-sale damages," we mean the $158,542 still unpaid.

[45]  *Latham Land*, 96 A.D.3d at 1330, 1331.

between surrender and sale, and second, post-sale damages represented by the diminished value of 1317 derived by comparing (1) the value of the property with the lease in place immediately before sale with (2) the lesser value represented by its allocable portion of the selling price of both properties (1301 and 1317). Although theoretically such two-step damage calculation may be feasible, we do not know from this record whether Livingston purported to arrive at his (miscalculated) diminished value as of the date of sale or, perhaps, had an earlier date – or even no date – in mind, leaving open the possibility of double-counting. We therefore vacate the $158,542 awarded to Landlord, subject to reconsideration on remand in connection with recalculation of diminished value damages.

**IV.**

Landlord filed an unopposed motion under Super. Ct. Civ. R. 54 (d) for an agreed upon amount of costs, expenses, and attorney's fees ($200,000) pursuant to § 23F of the lease. The trial court granted the motion in its March 27, 2013 order. According to Tenant's opening brief, the amount "was reasonable in light of the trial court's disposition of the case." Tenant argues, however, that if the damage award is vacated, we should "vacate the fee award as well" and "remand for

determination of proper fees (if any)," depending on Landlord's level of success under the "prevailing party" doctrine.

"A party prevails if [it] succeeds on any of the significant issues in the litigation which achieved some of the benefits sought by bringing the suit."[46] Landlord remains the prevailing party on the issue of liability, thus entitling it to attorney's fees under § 23F of the lease. However, "[i]t is generally understood that the degree of success in litigation is a relevant factor in the award of attorney's fees."[47]

We express no opinion on whether the negotiated award, as such, should remain in place, other than to confirm that Landlord prevails here on the availability of diminished value damages. On remand, therefore, the trial court should reevaluate and assess, as appropriate, the "costs, expenses, and attorney's fees" awardable to Landlord in light of the parties' negotiated award and of the recalculated damages for lost rent and diminished value.

---

[46] *Natural Motion by Sandra, Inc. v. District of Columbia Comm'n on Human Rights*, 726 A.2d 194, 198 n.9 (D.C. 1999) (internal quotation marks omitted).

[47] *Fleming v. Carroll Publ'g Co.*, 581 A.2d 1219, 1228 (D.C. 1990).

# V.

For the foregoing reasons, we vacate (subject to reconsideration on remand) the $158,542 awarded to Landlord for unpaid rent, taxes, and insurance during the period before sale; affirm the trial court's order to the extent of sustaining Landlord's right under the parties' lease to diminished value damages for Tenant's breach; reverse the order granting Landlord $5.7 million in diminished value damages and remand for further proceedings on that issue consistent with this opinion; and remand for reevaluation and assessment, as appropriate, of the "costs, expenses, and attorney's fees" awardable to Landlord.

*So ordered.*